# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 15-26538 |
| | ) | |
| SCOTT C. GILMORE, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| ———————————————— | ) | |
| | ) | |
| RAYMOND MICHAEL CHUIPEK, | ) | Adversary Case No. 15-00771 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTT C. GILMORE, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## MEMORANDUM OPINION

Raymond Michael Chuipek filed an adversary complaint in the chapter 7 bankruptcy case of Scott C. Gilmore, seeking a determination that a judgment debt owed to him by Gilmore is not dischargeable pursuant to 11 U.S.C. § 523(a)(6).[1] This matter is now before the Court on Chuipek's motion for summary judgment. For the reasons set forth below, the Court finds that there are no genuine issues of material fact and that Chuipek is entitled to judgment as a matter of law. As such, Chuipek's motion will be granted, and judgment will be entered in his favor.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

The facts in this case are gleaned from the docket, the pleadings, and the summary judgment statements and responses, as well as the exhibits attached thereto.  Among those exhibits are the transcripts from a joint jury-and-bench trial that was held over five days in February 2014 in the Sixteenth Judicial Circuit Court of Kane County, Illinois (the "state court"); the jury instructions from that trial; the verdict form completed by the jury on Chuipek's claims of retaliation; and an order entered by the state court on his claims for unpaid wages or commissions.  (*See* Adv. No. 15-00771, Docket No. 38, Def.'s Resp. to Mot. for Summ. J. ("Resp."), Exs. A-D & Docket No. 39, Pl.'s Reply to Def.'s Resp. ("Reply"), Exs. A-F.[2])  Most of the facts that follow are drawn from the parties' statements of material facts, which are supported by citations to these exhibits, as well as from the exhibits themselves.

At all times relevant to this matter, Chuipek suffered from Crohn's disease, a debilitating digestive disorder with which he was diagnosed at the age of eleven.[3]  (Docket No. 9, Answer to Adv. Compl. ¶ 20; Docket No. 29-1, Pl.'s Stmt. of Facts ("PSOF") ¶ 7; Tr. Ex. A at 245:13-246:21.[4])  As a result of this condition, Chuipek had chronic diarrhea and needed to use the bathroom on a frequent basis, sometimes as often as fifteen times a day.  (PSOF ¶ 9; Tr. Ex. A at 247:13-21.)  According to Chuipek, the disorder also caused him to suffer from severe abdominal pain, anemia,

---

[2] Unless otherwise noted, all docket references are to Adv. No. 15-00771.

[3] At the time of the state court trial in February 2014, Chuipek testified that he was thirty-seven years old.  (Tr. Ex. A at 246:18 (*see* footnote 4).)  Accordingly, he was diagnosed with Crohn's disease in 1988.

[4] Unless otherwise noted, transcript references are to the transcripts of the state court proceedings of February 3, 2014 ("Tr. Ex. A"), February 4, 2014 ("Tr. Ex. B"), February 5, 2014 ("Tr. Ex. C"), and February 6, 2014 ("Tr. Ex. D"), all of which are attached to the Reply at Docket No. 39.

rectal bleeding, fissures, and abscesses. (Tr. Ex. A at 247:22-248:11.) To control the symptoms of his Crohn's disease, Chuipek took a variety of medications, including a drug called Humira. (PSOF ¶ 11; Tr. Ex. A at 248:18-249:20.) While taking Humira, he had an adverse reaction that caused the formation of hundreds of cysts, or lipomas, in his body, some of which were painful and required surgical removal during the time in question. (PSOF ¶¶ 12 & 30; Tr. Ex. A at 249:15-250:12; Tr. Ex. B at 37:8-20.) In addition to surgery, treatment for Chuipek's condition and its symptoms included regular visits to his gastroenterologist and appointments with his internist every other month. (PSOF ¶ 10; Tr. Ex. A at 250:13-251:6.)

In or around 1990, two years after his diagnosis, Chuipek met Gilmore. (Tr. Ex. A at 251:20-252:3.) Both of their families attended the same church, and Chuipek and Gilmore were actively involved in church-related projects. (Docket No. 38-5, Def.'s Stmt. of Facts ("DSOF") ¶ 6; Tr. Ex. A at 251:24-252:3; Tr. Ex. D at 51:12-16.) Gilmore knew at that time that Chuipek had Crohn's disease. (PSOF ¶ 8; Tr. Ex. A at 255:11-14; Tr. Ex. C at 49:3-9.) According to Chuipek, it was "no secret," and, in fact, he and Gilmore had conversations about his disorder. (Tr. Ex. A at 255:11-21.)

### Chuipek's Employment at Smart Motion

Although the parties did not have contact for many years after Chuipek began college in 1995 (Tr. Ex. A at 254:15-255:2; Tr. Ex. C at 49:18-50:1), Gilmore reached out to him in May of 2008 to discuss a job opportunity. (Tr. Ex. A at 255:23-256:18; Tr. Ex. D at 50:6-19.) At the time, Gilmore was the president and co-owner of Smart Motion Robotics, Inc. ("Smart Motion"), a company that developed and sold robotic products for use in the egg industry.[5] (PSOF ¶¶ 3 & 4;

---

[5] At the time in question, Gilmore co-owned Smart Motion with his wife, Vickie Gilmore, who handled all of the human resources responsibilities for the company. (PSOF ¶ 4; Tr. Ex. D at 36:17-24.)

DSOF ¶¶ 1 & 2; Tr. Ex. D at 36:15-24, 43:13-45:6.)  According to Chuipek, Gilmore met with him

at Smart Motion, where Chuipek learned about the company's operations and told Gilmore about

his education and previous work experience.[6]  (Tr. Ex. A at 257:3-24.)  During the meeting, the

parties also discussed Chuipek's Crohn's disease.  (*Id.* at 258:24-259:9; Tr. Ex. D at 53:7-14.)

Specifically, Chuipek testified that Gilmore asked him how he was feeling, and Chuipek responded

that he was "doing okay," was "working through some issues," and had recently been to several

doctor's appointments in connection with his disorder.  (Tr. Ex. A at 258:24-259:9.)

Subsequently, Chuipek was offered a job as vice president of sales and marketing at Smart

Motion.  (PSOF ¶ 1; Tr. Ex. A at 258:1-6, 263:14-21; Tr. Ex. C at 53:3-6; Tr. Ex. D at 53:15-20.)

The offer letter, dated June 9, 2008, provided for a compensation package of $48,000 per year, plus

4.25% of the company's total gross sales.  (PSOF ¶ 2; Tr. Ex. A at 258:18-23, 260:1-261:3; Tr. Ex.

C at 54:3-13; Tr. Ex. D at 55:9-56:21.)   At the time of hire, Chuipek told Gilmore that he would

need to take time off to attend doctor's appointments in connection with his Crohn's disease.  (PSOF

¶ 13; Tr. Ex. A at 259:10-23; Tr. Ex. C at 58:16-22.)  Gilmore assured Chuipek that he would be able

to go to those appointments, telling him not to "worry about any of that."  (Tr. Ex. A at 259:10-23;

Tr. Ex. C at 58:16-59:6.)

On June 16, 2008, Chuipek began working at Smart Motion.  (PSOF ¶ 5; DSOF ¶ 10; Tr. Ex.

A at 251:16-17, 263:21-24.)  According to his testimony, Chuipek used an existing list of leads to

---

[6] According to Chuipek's testimony, he has an undergraduate degree in finance and management, as well as a Master of Business Administration, both from DePaul University.  (Tr. Ex. A at 243:5-13.)  As for his prior work experiences, Chuipek testified that he initially worked at Hewitt, a human resource benefit consulting company, and then took on various roles with increasing responsibility at Motorola, Coleman Powermate, and Sears Holdings. (*Id.* at 243:14-244:3.)  While at Sears, he said, he helped manage a budget of approximately $750 million. (*Id.* at 244:4-12.) Chuipek testified that he lost his job in April 2008 when Sears eliminated the division in which he worked. (*Id.* at 244:13-20.)

start forming relationships with potential customers. (Tr. Ex. A at 266:19-270:21.) He also testified that he began to build the marketing department, developing a completely new marketing campaign for Smart Motion. (*Id.* at 271:16-272:14.) Chuipek further testified that in 2008, his first year at the company, he brought in just under half a million dollars in business. (*Id.* at 272:15-273:3.) That figure nearly quadrupled the following year, during which, Chuipek said, he generated approximately $1.8 million in sales. (*Id.* at 277:23-278:18.) Correspondingly, Gilmore testified that Smart Motion grossed over $1 million in sales in 2008 and more than $2.3 million in 2009. (Tr. Ex. C at 66:6-19.)

In addition to his domestic clients, Chuipek testified that he started to expand Smart Motion's business beyond the United States by creating a list of potential customers in Latin America, South America, Canada, and Europe. (Tr. Ex. A at 274:15-275:5.) According to Chuipek, he was ultimately able to procure a letter of intent, dated October 2, 2009, from a Latin American company called El Tunal, which promised more than $1.2 million in business for Smart Motion. (*Id.* at 276:22-277:22, 279:3-281:16; *see also* Tr. Ex. B at 6:19-8:4.) Although no formal performance appraisal was conducted, Chuipek testified that Gilmore told him that his sales performance in 2009 had given Gilmore "the best year [he had] ever had." (Tr. Ex. A at 278:19-23.)

In the summer of 2009, Gilmore asked Chuipek to meet with him and his wife Vickie Gilmore ("Vickie") to report on his sales activities. The parties gave starkly conflicting accounts of what took place during that meeting, which was held on August 24, 2009.

According to Gilmore, Chuipek told him that he was following no leads, and, in response to Gilmore's questions about specific leads, Chuipek "just shrugged his shoulders." (DSOF ¶¶ 12-14; Tr. Ex. D at 87:1-88:20.) In addition, Gilmore testified that when questioned about the status of a leasing program, Chuipek's response was that "[h]e [had not] done anything on it for months,

5

never." (DSOF ¶ 15; Tr. Ex. D at 88:21-89:15.)  After the meeting, Gilmore said, he gave Chuipek

sixty days to "turn around" his sales performance.  (DSOF ¶ 16; Tr. Ex. D at 100:9-11.)

Chuipek's version of the events markedly differs from Gilmore's.  According to Chuipek,

Gilmore called the meeting not out of concern about Chuipek's performance but because he needed

sales projections to obtain a bank loan to build a new facility.  (Tr. Ex. B at 15:21-16:18; *see also*

Tr. Ex. C at 84:7-86:10.)  In preparation for the meeting, Chuipek said that he prepared a list of leads

he was pursuing and then, during the meeting, provided Gilmore with a detailed update on those

leads. (Tr. Ex. B at 17:12-19:4.)  Chuipek testified that at no point during the meeting did Gilmore

criticize his sales performance.  (*Id.* at 19:13-21.)

### Complaints Against Gilmore

In addition to issues regarding Chuipek's sales performance, an uneasy storm was building

on various other fronts at Smart Motion.  One of those centered on the language that Gilmore

allegedly used in the workplace.  Specifically, Chuipek testified that throughout his employment at

Smart Motion, he heard Gilmore make comments that were inappropriate and offensive.  According

to Chuipek:

- Gilmore would refer to African-Americans as "niggers" and say that he did not want to hire them because "they were lazy."  (PSOF ¶ 23; Tr. Ex. B at 27:23-28:9.)

- He stated both in the office and on the shop floor that he would hire only "short, fat, ugly Mexican women" so that they could "do their work and no one would look at them." (PSOF ¶¶ 22, 49, 57; Tr. Ex. B at 26:21-27:3; *see also* Tr. Ex. C at 183:23-184:20, 203:2-5.)

- He routinely referred to women as "bitches" and called the female employee who worked in the Parts Department the "parts bitch." (PSOF ¶¶ 14 & 15; Tr. Ex. B at 20:6-21:12.)

- In one instance, Gilmore asked Chuipek's sister Mallory Vos ("Mallory"), an administrative assistant at Smart Motion, if the bottle of Naked Juice that she was drinking would make her "get naked" and if he could give some to his wife so that she would "get naked" for him. (PSOF ¶¶ 16 & 54; Tr. Ex. B at 21:17-24; *see also* Tr. Ex. C at 201:4-8.)

- He came out onto the shop floor with "suction nipples" held up to his chest and said that he could not talk to Mallory without her blushing. (PSOF ¶ 55; *see also* Tr. Ex. C at 201:9-14.)

- When asked if he wanted to keep some magazines that were being cleared out of the office, he told Mallory, "Not unless they're *Penthouse*." (PSOF ¶ 56; *see also* Tr. Ex. C at 201:15-18.)

- Gilmore routinely said on the shop floor that he wanted "a fur burger with a side order of thighs." (PSOF ¶¶ 17 & 45; Tr. Ex. B at 22:6-13.)

- On one occasion, he said on the shop floor that a female worker would not be at work because "she was having problems with her vagina." (PSOF ¶ 18; Tr. Ex. B at 22:17-24.)

- When conducting training on the shop floor, Gilmore told trainers that the egg industry robots "were better than women because they [did not] call in sick and they [did not] bleed out [of] their vaginas." (PSOF ¶ 19; Tr. Ex. B at 24:13-18.)

Chuipek testified that he repeatedly told Gilmore to stop making inappropriate comments.[7] (PSOF ¶¶ 20 & 58; Tr. Ex. B at 24:22-25:1.)   Despite his complaints, Chuipek said, the comments continued. (Tr. Ex. B at 25:5-9.) According to Chuipek, things got so bad that he met with Gilmore on October 5, 2009 and told him that his comments were "racist," "sexist," and "discriminatory" and that "they had to stop." (PSOF ¶ 21; Tr. Ex. B at 25:5-18, 26:16-28:13.)   Chuipek stated that Gilmore's response was to tell him to "just relax." (Tr. Ex. B at 28:21-24.)

---

[7] Adam Vos ("Adam"), a former employee at Smart Motion and Mallory's husband, testified that he also heard Gilmore make inappropriate and offensive comments and complained to Gilmore about his use of the "foul language" and "sexual innuendos." (PSOF ¶ 51; Tr. Ex. C at 183:17-186:8.)  Gilmore told Adam that he would "work on that." (PSOF ¶ 51; Tr. Ex. C at 186:7-9.)

Around the same time, Chuipek said, he also complained to Gilmore that he was not being accommodated with respect to his Crohn's disease.  (PSOF ¶ 42; Tr. Ex. B at 29:5-7.)  The complaint was based on Chuipek's frequent and often urgent need to use the bathroom.  Chuipek testified that during his employment, particularly in the summer and fall months of 2009, he began to notice that the door to the only men's bathroom at Smart Motion was frequently closed with the light turned on, giving the impression that the bathroom was in use when, in fact, no one was in there.  (PSOF ¶¶ 24 & 40; Tr. Ex. B at 29:11-20.)  Gilmore admitted that, on at least one occasion during the summer of 2009, he himself closed the bathroom door and left the light and fan on in order to discourage people from going in.[8]  (PSOF ¶ 41; Tr. Ex. C at 102:13-18, 105:19-106:3.)  Because the bathroom often appeared to be in use, Chuipek had to drive to a local gas station over a period of months in order to use the bathroom there.  (PSOF ¶ 25; Tr. Ex. B at 29:21-30:6.)  According to Chuipek, Gilmore would sometimes be waiting at the entry door when he returned, glaring at him, and Gilmore would say, "Going to the gas station again?"  (Tr. Ex. B at 31:2-5.)

Upon learning that the bathroom at Smart Motion was not always occupied when the door was closed, Chuipek asked Gilmore if he could put a sign on the door directing people to leave it open when the bathroom was not in use.  (PSOF ¶¶ 26 & 43; Tr. Ex. B at 32:5-33:5; Tr. Ex. C at 100:19-24.)  Gilmore denied that request, stating that a sign was not necessary.[9]  (PSOF ¶ 44; Tr. Ex. B at 33:5-8; Tr. Ex. C at 101:2-8.)

---

[8] During the time he worked at Smart Motion in 2008 and 2009, Adam also noticed that the door to the men's bathroom was shut with the lights on more often than it had been in the past.  (PSOF ¶ 47; Tr. Ex. C at 182:1-7.)  Gilmore told him that he was closing the bathroom door and turning the lights on to deter employees from using it.  (PSOF ¶ 48; Tr. Ex. C at 182:8-12.)

[9] According to Chuipek, in denying the request to post a sign, Gilmore said that "[p]eople [can] shit on their own time."  (PSOF ¶ 27; Tr. Ex. B at 33:6-8.)

Chuipek testified that after he confronted Gilmore about his inappropriate comments and the issues with the bathroom in connection with his Crohn's disease, Gilmore's attitude toward him changed. (Tr. Ex. B at 34:1-9.) Specifically, Chuipek said that Gilmore's interactions with him were "standoffish," "cold," and "icy." (*Id.* at 34:11-13.) According to Chuipek, Gilmore even began delaying the approval of Chuipek's sales, saying "for the first time ever" that he wanted to "chew on" the quotes that he would have simply "rubber-stamp[ed]" in the past. (*Id.* at 34:13-22.)

Subsequently, Chuipek began having trouble with some of the cysts that had formed in his body and needed to get them surgically removed. (*Id.* at 35:3-7.) Accordingly, on November 1, 2009, he sent Gilmore an email, asking to carry over three vacation days from the previous year and also to take a couple of extra sick days in order to undergo the surgery. (PSOF ¶ 28; Tr. Ex. B at 35:13-36:7; Tr. Ex. C at 108:14-18.) His request was denied. (PSOF ¶ 29; Tr. Ex. B at 36:17-23.)

### The November 6 Meeting and Its Aftermath

On November 6, 2009, five days after Chuipek sent the email requesting time off to have surgery, Gilmore asked Chuipek to meet with him and Vickie. (PSOF ¶ 31; Tr. Ex. B at 39:9-17.) At the meeting, Gilmore questioned Chuipek about his complaints, seeking to discover whom he had spoken to about sexual harassment, discrimination, and his Crohn's disease and asking whether he was planning to sue Gilmore and if he had hired an attorney. (PSOF ¶¶ 31 & 32; Tr. Ex. B at 39:14-40:2.) Chuipek testified that after he assured Gilmore that he had not been talking to anyone and was not planning to sue him, Gilmore told him that he was "a thorn in [Gilmore's] side" and that his employment was terminated. (PSOF ¶¶ 32 & 46; Tr. Ex. B at 39:20-40:6; *see also* Tr. Ex. C at 123:9-23.) Gilmore also told Chuipek to turn in his key, which he did. (PSOF ¶ 33; Tr. Ex. B at 41:6-8.)

9

Before Chuipek left, Gilmore gave him a new employment contract titled "Agreement" that he told Chuipek to sign. (PSOF ¶ 34; Tr. Ex. B at 40:9-41:19.) The portions of the agreement regarding compensation were blank. (*Id.*; *see also* Tr. Ex. B at 42:24-45:10; Tr. Ex. C at 114:19-115:19.) Chuipek said that despite his requests that Gilmore fill in those blanks, he refused to do so. (Tr. Ex. B at 45:15-46:16; Docket No. 38-2, State Ct. Order of June 23, 2014 ("June 23 Order") at 6; *see also* Tr. Ex. C at 125:13-15.) According to Gilmore, under the new agreement Chuipek was to receive only commission, without a fixed salary, and would ultimately be making about half of his then-current compensation. (Tr. Ex. C at 117:20-118:14.) Gilmore testified that the terms of the new contract were non-negotiable and that if Chuipek did not sign it, he could tender his resignation. (*Id.* at 124:20-24.)

Two days later, on November 8, 2009, Chuipek sent Gilmore an email message, asking for an extra vacation day to be used the following day for a previously-scheduled doctor's appointment. (DSOF ¶ 19.) According to Chuipek, he made the request because he was confused about his employment status, given the fact that he had been provided with a new agreement. (Docket No. 39-1, Pl.'s Resp. to DSOF ¶ 19.)

Notwithstanding his request for a vacation day, Chuipek came into the office on November 9, 2009. (PSOF ¶ 35.) He testified that he did so in "a last ditch effort" to get Gilmore to fill in the compensation figures in the new agreement and also to submit his expense report as he had been directed to do. (PSOF ¶¶ 35 & 36; Tr. Ex. B at 47:11-48:6.) According to Chuipek, Gilmore would not fill in the blanks, so Chuipek went to his desk and packed his things. (Tr. Ex. B at 48:7-49:10.) On his way out, Chuipek claimed that Gilmore said, "[I]f you want to fight, I'll give you a fight." (*Id.* at 49:12-15.)

After leaving Smart Motion, Chuipek was unemployed for a period of time. (*Id.* at 49:18-20.) As a result, he had trouble sleeping and suffered from depression, anxiety, and weight loss. (PSOF ¶ 37; Tr. Ex. B at 49:21-22, 50:15-24.) His doctors prescribed sleeping pills and Xanax, the latter to treat his anxiety. (PSOF ¶ 39; Tr. Ex. B at 51:1-5.) Because of his lack of income, he and his wife decided to hold off on starting a family. (PSOF ¶ 38; Tr. Ex. B at 50:8-14.)

On October 27, 2011, Chuipek filed a complaint against Smart Motion and Gilmore (together, the "Defendants") in the state court. (Docket No. 1, Adv. Compl. ¶ 11.) Based on the allegations in the complaint, Chuipek sought damages against the Defendants on ten counts, eight for retaliation under the Illinois Human Rights Act (the "IHRA") and 42 U.S.C. § 1981 ("§ 1981")[10] and two for unpaid wages under the Illinois Wage Payment and Collection Act (the "IWPCA").[11]

_____

[10] Section 6-101 of the IHRA provides, in relevant part, as follows:

> It is a civil rights violation for a person[] . . . to . . . [r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment . . . , [or] discrimination based on citizen status in employment, because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act, or because he or she has requested, attempted to request, used, or attempted to use a reasonable accommodation as allowed by this Act[.]

775 ILCS 5/6-101.

In turn, § 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981.

[11] Section 14 of the IWPCA, entitled "Refusal to pay wages or final compensation; failure to obey order to pay wages; retaliatory discharge or discrimination; penalties," provides, in relevant part, as follows:

> Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

11

(Docket No. 29, Pl.'s Mot. for Summ. J. ¶ 12; *see also* Docket No. 38-1, Jury Instrs. at 12-20.) The five counts against Gilmore were as follows:

- IHRA retaliation by Gilmore for Chuipek's complaints of disability discrimination (Count 2);

- IHRA retaliation by Gilmore for Chuipek's request for a reasonable accommodation for his disability (Count 4);

- IHRA retaliation by Gilmore for Chuipek's complaints of discrimination on the basis of race and/or national origin and/or gender and/or sexual harassment (Count 6);

- Section 1981 retaliation by Gilmore for Chuipek's complaints of race and/or national origin discrimination (Count 8); and

- Violation of the IWPCA for unpaid wages (Count 10).[12]

(Adv. Compl. ¶ 11; Pl.'s Mot. for Summ. J. ¶ 12.) The retaliation claims were heard and decided by a jury, the unpaid wages claims by the state court judge.

## Jury Instructions

The instructions provided to the jury required Chuipek to prove four elements for each count in order for the jury to return a verdict on the IHRA retaliation claims in his favor and against Gilmore. First, Chuipek had to establish that he engaged in the following "protected activit[ies]": (a) he complained that Gilmore's "conduct of closing the bathroom door to keep people from using [it] was disability discrimination against him" (Count 2); (b) he requested "one or more reasonable accommodations" from Gilmore for "his disability: Crohn's disease" (Count 4); and (c) he

---

820 ILCS 115/14.

[12] Counts 1, 3, 5, 7, and 9 were brought against Smart Motion and mirrored the claims against Gilmore. (Pl.'s Mot. for Summ. J. ¶ 12; Jury Instrs. at 13, 15, 17, 19.)

complained that Gilmore "engaged in conduct" that Chuipek "reasonably and in good faith believed

to be race discrimination and/or national origin discrimination and/or gender discrimination and/or

sexual harassment" (Count 6). (Jury Instrs. at 14, 16, 18.) Additionally, Chuipek had to demonstrate

for each count that Gilmore "took an adverse employment action" against him; that "a causal

connection" existed between each protected activity and Gilmore's adverse employment action; and

that Gilmore "aided and [abetted] Smart Motion" in taking the adverse employment action against

Chuipek or was "otherwise personally motivated to retaliate against" him. (*Id.*)

As for the § 1981 retaliation claim against Gilmore, the jury was instructed that Chuipek had

the burden of proving each of the following elements: (1) that he engaged in the "protected activity"

of complaining that "certain conduct of . . . Gilmore" was "discriminatory on the basis of race and/or

national origin"; (2) that Gilmore "took an adverse employment action" against him; (3) that "a

causal connection" existed between his protected activity and Gilmore's adverse employment action;

and (4) that Gilmore "participated" in the adverse employment action. (*Id.* at 20.)

For purposes of all of the retaliation claims, the jury instructions provided that a "causal

connection" meant "a cause that, in the natural or ordinary course of events, produced [Chuipek's]

injury." (*Id.* at 11.) The jury was further instructed that a "causal connection" did not "need [to] be

the only cause, nor the last or nearest cause. It [was] sufficient if it combine[d] with another cause

resulting in the injury." (*Id.*)

With respect to the § 1981 retaliation claims, the jury was told that the law permits the award

of punitive damages, in addition to compensatory damages, if it found that Gilmore's conduct was

in "reckless disregard" of Chuipek's rights and "proximately caused injury and damages" to

Chuipek. (*Id.* at 22.) The instructions also provided that, in arriving at its decision as to the amount

13

of punitive damages, the jury was to consider, most importantly, how "reprehensible" Gilmore's conduct was, as well as what "actual and potential harm" Gilmore's conduct caused to Chuipek and what amount of money was necessary to punish Gilmore and discourage him and others from future "wrongful conduct." (*Id.*)

### Jury Verdict and State Court Judgment

On February 7, 2014, after a five-day joint jury-and-bench trial, during which Gilmore, Chuipek, and six other witnesses testified, the jury returned a verdict in favor of Chuipek and against Gilmore on all four retaliation counts. (PSOF ¶ 61; Docket No. 38-4, Jury Verdict.) A judgment on the verdict awarded damages as follows: (a) $400,000 for the value of earnings and commissions lost up to the date of the trial; (b) $25,000 for emotional distress, including humiliation; and (c) $25,000 in punitive damages, all as a result of Gilmore's retaliatory conduct.[13] (*Id.*)

Following the verdict, the Defendants filed a motion alleging various errors and seeking, alternatively, judgment notwithstanding the verdict, a new trial, or remittitur of the jury's award. (*See* June 23 Order at 3-7 ¶¶ 12-35.) The state court judge denied the Defendants' motion in an order dated June 23, 2014. (*Id.* at 7 ¶ 36.) In connection with the Defendants' argument that Gilmore should not have been held personally liable under the IHRA when he was acting on behalf of Smart Motion, the judge explained that case law allows for "personal liability on a finding of personal motivation to retaliate" and expressly stated that "there was sufficient evidence of such personal motivation by Gilmore." (*Id.* at 7 ¶ 35.)

In addition to ruling on the Defendants' post-trial motion in its June 23 Order, the state court entered judgment in favor of Chuipek and against Gilmore and Smart Motion, jointly and severally,

---

[13] The jury also assessed punitive damages of $25,000 against Smart Motion; thus, the judgment on the jury's verdict awarded Chuipek a total of $475,000. (Jury Verdict at 3.)

14

on the unpaid wages claim, awarding $25,751.82 in damages for violation of the IWPCA for the time

period during which Chuipek was employed at Smart Motion. (PSOF ¶ 62; June 23 Order at 8.) The

judgment also provided for $19,500 in pre-judgment interest on the jury's back-pay award, $163,430

in attorneys' fees, and costs in the amount of $8,230.38, all awarded to Chuipek against the

Defendants, jointly and severally. (PSOF ¶ 62; June 23 Order at 9.) Gilmore did not appeal either

the judgment on the verdict or the June 23 Order entered by the state court. (PSOF ¶ 63.)

## Bankruptcy and Adversary Proceedings

On August 3, 2015 (the "Petition Date"), Gilmore filed a voluntary petition for relief under

chapter 7. (Bankr. No. 15-26538, Docket No. 1.) On schedule D, he listed Chuipek as a creditor

with a judgment lien of $666,912.20. (*Id.*)

About two months later, on October 14, 2015, Chuipek filed an adversary complaint against

Gilmore, seeking a determination that the debt at issue is excepted from discharge pursuant to §

523(a)(6). (Docket No. 1.) Gilmore filed an answer to the complaint on December 11, 2015.

(Docket No. 9). Subsequently, on September 8, 2017, after discovery was conducted and numerous

status hearings held, Chuipek filed the instant motion for summary judgment. (Docket No. 29.)

After the motion was fully briefed, the Court took the matter under advisement. Having reviewed

all of the relevant documents, the arguments of the parties, and the applicable case law, the Court

is now ready to rule.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to

adversary proceedings by Fed. R. Bankr. P. 7056). The primary purpose of the summary judgment

procedure is to avoid unnecessary trials where no genuine issues of material fact are in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987). Thus, on a motion for summary judgment, the court must decide, based on the evidence, whether there is a material disputed fact that requires a trial. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).

The party seeking summary judgment always bears the burden of establishing that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the movant has met his burden, the court must view all reasonable inferences drawn from the underlying facts in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248; *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011). Once the moving party satisfies his initial burden of production, the party opposing the motion may not rest on the mere allegations or denials in his pleadings; rather, his response must set forth specific facts demonstrating that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

All factual assertions made in a summary judgment motion must be supported by citations to particular parts of material in the record, including depositions, documents, affidavits, admissions,

interrogatory answers, and other materials. Fed. R. Civ. P. 56(c)(1)(A). Likewise, a party asserting that a fact is genuinely disputed must support that assertion with citations to the record. *Id.* Facts that are denied without evidentiary support for the denials are deemed admitted. Local Bankr. R. 7056-2(B) ("[A]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Maxwell v. Penn Media (In re marchFirst, Inc.)*, Bankr. No. 01 B 24742, Adv. No. 03 A 1141, 2010 WL 4027723, at *2 (Bankr. N.D. Ill. Oct. 14, 2010); *see also Williams v. City of Chi. Bd. of Educ.*, No. 10 C 7105, 2012 WL 3023313, at *4 (N.D. Ill. July 24, 2012) ("[T]o the extent that any of [a party's] denials do not contain a citation to the record or the citation does not support the denial, those statements of fact . . . [are] deemed admitted.").

Of the sixty-three paragraphs in Chuipek's statement of facts, Gilmore admits to only ten. Although he denies the factual assertions in almost all of the remaining paragraphs, he fails to cite to evidence that supports most of his denials. (*See* Docket No. 38-5, Def.'s Resp. to PSOF ¶¶ 9, 10-13, 25, 26, 28-31, 33-39, 41, 43, 44, 47, 48, 51, 52, 54, 56, 58-60.) In fact, many of the citations that Gilmore provides altogether fail to address the assertions made by Chuipek, and others actually provide support for those assertions or contradict Gilmore's denials. (*See, e.g., id.* ¶¶ 13, 25, 29, 30, 37-39, 41, 48, 59, 60.) To the extent that Gilmore's denials are not supported by citations to the record, the corresponding facts made by Chuipek have been deemed admitted.

While Gilmore provides citations that support his denials of certain statements of fact, including those asserting his use of inappropriate language (*see id.* ¶¶ 14-23, 27, 32, 42, 45, 46, 49, 50, 55, 57), many of those are merely citations to his state court testimony in which he baldly and summarily disavows any wrongdoing. In any event, as discussed *infra*, those denials are of no

17

consequence in the context of collateral estoppel, given the jury's verdict in favor of Chuipek and

against Gilmore on all four retaliation claims.

## DISCUSSION

In his motion for summary judgment, Chuipek contends that he is entitled to judgment as a

matter of law through the application of collateral estoppel.  Under that doctrine, Chuipek argues,

Gilmore is precluded from re-litigating the factual issues decided in the state court proceedings and

those facts establish, as a matter of law, that the debt at issue is nondischargeable pursuant to §

523(a)(6).  Specifically, Chuipek argues that the questions answered by the jury–based on the

evidence from the state court proceedings–are sufficient to meet the willful and malicious standard

of the statutory exception to discharge.  In response, Gilmore asserts that, although the jury found

in Chuipek's favor, there was no finding of subjective intent to willfully and maliciously injure

Chuipek.  Accordingly, Gilmore argues, collateral estoppel may not be applied here, and the motion

for summary judgment under § 523(a)(6) must be denied.

### 1.  Collateral Estoppel

Bankruptcy courts ordinarily make independent decisions as to whether debts are

nondischargeable under the various provisions of § 523(a).  *See Meyer v. Rigdon*, 36 F.3d 1375,

1378 (7th Cir. 1994).  It is well established, however, that the doctrine of collateral estoppel, or issue

preclusion, applies in bankruptcy discharge exception proceedings. *Grogan v. Garner*, 498 U.S. 279,

284 n.11 (1991); *Klingman v. Levinson*, 831 F.2d 1292, 1294-95 (7th Cir. 1987).  Accordingly, "if

a court of competent jurisdiction has previously entered judgment against [a] debtor," collateral

estoppel may bar the debtor from re-litigating "the underlying facts in the bankruptcy court." *Meyer*,

36 F.3d at 1378.  Indeed, a bankruptcy court can find that a debt is nondischargeable based *solely*

18

on the evidence of the prior proceeding, as long as the judgment in that proceeding was obtained

fairly, the defendant was accorded due process, the complaint and judgment order are unambiguous

that the judgment debt is "of a non-dischargeable nature," and the record from the prior proceeding

is before the bankruptcy court. *U.S. Life Title Ins. Co. of N.Y. v. Wade (In re Wade)*, 26 B.R. 477,

481 (Bankr. N.D. Ill. 1983). By precluding the re-litigation of the same factual issues between the

same parties, collateral estoppel preserves judicial resources, lessens the cost and vexation of

multiple lawsuits, and prevents the issuance of inconsistent decisions. *Allen v. McCurry*, 449 U.S.

90, 94 (1980); *Sylvester v. Martin (In re Martin)*, 130 B.R. 930, 942 (Bankr. N.D. Ill. 1991).

Where a prior decision was made by a state court, the collateral estoppel of that state governs.

*Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014). Because the judgments against Gilmore

were entered in an Illinois state court, the Illinois law of collateral estoppel applies. The elements

of collateral estoppel under Illinois law are as follows: (1) a prior case presented the same issue; (2)

the issue was actually litigated and decided on the merits in the prior suit; (3) the resolution of the

issue was necessary to the court's judgment; (4) the case ended in a final judgment on the merits; and

(5) the party against whom estoppel is asserted was a party in the prior case. *Id.*; *Wians v. Wians (In*

*re Wians)*, 523 B.R. 124, 129 (Bankr. N.D. Ill. 2014).

"Under collateral estoppel, once an issue is actually and necessarily determined by a court

of competent jurisdiction, that determination is conclusive in subsequent suits based on a different

cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147,

153 (1979); *see also Dexia Crédit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010) (explaining that

collateral estoppel "bars successive litigation of an issue of fact or law actually litigated and resolved

in a valid court determination essential to the prior judgment, even if the issue recurs in the context

19

of a different claim"); *S. Cal. Gas Co. v. Collier*, Bankr. No. 08 B 22708, Adv. No. 08 A 01008,

2010 WL 1241778, at *2 (Bankr. N.D. Ill. Mar. 23, 2010) (stating that "[c]ollateral estoppel

forecloses relitigation of legal and factual issues even if they arise in a new legal claim in the second

case").

"Collateral estoppel is properly applied to factual inferences drawn from a general jury

verdict where such findings are necessarily implied by the prior verdict. Inferences are implied by

a prior verdict if they are necessary to support that verdict, and a rational jury thus must have made

such findings." *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017) (internal citations

omitted); *see also FNA Grp., Inc. v. Arvanitis (In re Arvanitis)*, 523 B.R. 633, 641 (Bankr. N.D. Ill.

2015) (finding that although collateral estoppel under Illinois law "applies only to issues that have

been necessarily and unambiguously decided, express factual findings are not required" and an "issue

may be decided from findings implicit in the judgment"). "When applying collateral estoppel to a

jury verdict, the task is to glean the specific findings on which the jury based its verdict." *KYMN,*

*Inc. v. Langeslag (In re Langeslag)*, 366 B.R. 51, 59 (Bankr. D. Minn. 2007). Such a determination

"requires a close inspection of the trial judge's instructions to the jury. If . . . the instructions

permitted an adjudication of liability on one and only one set of specific, predicate fact-findings, the

only inference is that the jury found those facts." *Id.*

In this matter, Gilmore contests the first three elements required for the application of

collateral estoppel–that the issues decided in the state court were identical to the issues in this matter,

that those issues were actually litigated in the prior case, and that their resolution was necessary to

the state court's judgments. In essence, however, Gilmore really disputes only the first element,

arguing that the issues in the state court case were not the same as the ones in the nondischargeability

20

proceeding at bar.

To determine whether an identity of issues exists, the Court must find either: (1) that the elements of retaliation under the IHRA and § 1981 are the same as the elements of § 523(a)(6), or (2) that the judgment on the jury's verdict under the IHRA and § 1981 was based on material and necessary factual findings sufficient to support a determination of "willful and malicious" injury under the statutory exception to discharge. *See Rocco v. Goldberg (In re Goldberg)*, 487 B.R. 112, 123 (Bankr. E.D.N.Y. 2013). As discussed below, the Court finds, based on a close inspection of the entire state court record, that the facts necessarily implied by the jury's verdict establish that Gilmore's conduct was willful and malicious and that it caused injury to Chuipek. Accordingly, the prior case presented the same issues, and collateral estoppel applies to the factual record here, thus barring Gilmore from re-litigating the underlying facts decided in the state court case in this forum.

## 2. Exception to Discharge Under § 523(a)(6)

Chuipek argues that he entitled to judgment as a matter of law under § 523(a)(6) because the jury's verdict, the testimony at trial, and the rest of the state court record satisfy the requisite elements under that statutory provision. As the party seeking to establish an exception to discharge, Chuipek bears the burden of proof by a preponderance of the evidence. *See Grogan*, 498 U.S. at 291; *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997). Exceptions to discharge must be construed strictly against the plaintiff and liberally in favor of the debtor. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). Additionally, § 523(a) is to be "narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Shriners Hosp. for Children v. Bauman (In re Bauman)*, 461 B.R. 34, 44 (Bankr. N.D. Ill. 2011) (internal quotation omitted). Although the burden of going forward with the evidence may occasionally shift, the

21

ultimate burden remains with the plaintiff. *Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003); *see also Penix v. Parra (In re Parra)*, 483 B.R. 752, 774 (Bankr. D.N.M. 2012).

Turning to the statutory provision that Chuipek has invoked, § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). To demonstrate a claim under § 523(a)(6), Chuipek must prove that Gilmore: (1) acted intentionally and thereby caused an injury; (2) acted willfully; and (3) acted maliciously. *See Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 756 (Bankr. N.D. Ill. 2010); *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 641 (Bankr. N.D. Ill. 2004).

### A. Injury

In this matter, the parties do not dispute that Gilmore's intentional conduct caused Chuipek's injuries. The state court evidence conclusively shows that Gilmore terminated Chuipek from his position as vice president of sales and marketing at Smart Motion.[14] And Chuipek's uncontested testimony at trial demonstrates that, as a result of losing his job, he had trouble sleeping, suffered from weight loss, and became depressed and anxious. Accordingly, the first element of § 523(a)(6) has been satisfied, and the only issues left to be decided here are whether Gilmore caused Chuipek's injures by conduct that was willful and malicious.

---

[14] Gilmore disputes that he terminated Chuipek, claiming instead that he offered Chuipek another position through an employment contract with different terms but that Chuipek rejected that contract. (Tr. Ex. C at 114:19-119:11, 138:20-22, 162:23-163:18, 164:3-5.) Gilmore concedes, however, that he terminated the initial agreement that the parties had executed in June 2008 under which Chuipek had been hired as vice president of sales and marketing at Smart Motion. (*Id.* at 131:6-14.) Thus, even if not expressly stated, any reference in this Memorandum Opinion to Chuipek's termination is to the termination of his job as vice president of sales and marketing.

## B. Willfulness

Under § 523(a)(6), willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (quoting *Geiger*).   In other words, "willful" means intent to cause injury, not simply the commission of an intentional act that results in injury. *Koplin v. Ginsberg (In re Ginsberg)*, Bankr. No. 08 B 30836, Adv. No. 09 A 188, 2009 WL 4891815, at *5 (Bankr. N.D. Ill. Dec. 16, 2009) (citing *Geiger*); *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 704 (Bankr. N.D. Ill. 2002) (same).   Negligently or recklessly inflicted injuries do not fall within the ambit of § 523(a)(6). *Geiger*, 523 U.S. at 64.   For purposes of the statutory exception, "willfulness" can be found if Gilmore either subjectively intended to injure Chuipek or knew that injury was substantially certain to result from his acts. *See Horsfall*, 738 F.3d at 774 (explaining that a plaintiff can establish "willfulness" by showing that the "debtor's motive was to inflict the injury[] or the debtor's act was substantially certain to result in injury" (internal quotation omitted)); *see also Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015); *Zamora v. Jacobs (In re Jacobs)*, 403 B.R. 565, 581 (Bankr. N.D. Ill. 2009).   As to the latter, the "substantial certainty" test is consistent with the Code's "fresh start" goal in that it "focuses on whether the injury was in fact anticipated by the debtor[.]" *Fid. Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713, 719 (Bankr. N.D. Ill. 2000) (internal quotation omitted) (discussing the "substantial certainty" test in the context of conversion).   The test is also consistent with *Geiger*, which requires a showing that the debtor intended the consequences of his harmful actions. *Id.*

Having reviewed the ample state court record, the Court finds that in determining that Gilmore retaliated against Chuipek, the jury necessarily and implicitly found that Gilmore acted both

23

with the subjective intent to injure Chuipek and with the knowledge that his conduct was

substantially certain to cause harm. Specifically, the jury determined that Gilmore engaged in

workplace retaliation in violation of both the IHRA and § 1981. Based on the instructions provided

to the jury, there is only one set of possible findings that could support the verdict that the jury

actually rendered: (1) that Gilmore failed to provide reasonable accommodations for Chuipek in

connection with his Crohn's disease, and (2) that he unlawfully terminated Chuipek from his position

as vice president of sales and marketing for requesting those accommodations and for complaining

to Gilmore about his discriminatory conduct and comments. Specifically, the jury found that

Chuipek engaged in the "protected activities" of complaining that Gilmore's closing of the bathroom

door to keep people from using it was disability discrimination against him, requesting reasonable

accommodations from Gilmore for his medical condition, and complaining that Gilmore's conduct

was discriminatory based on race, national origin, and/or gender. The jury further found that

Gilmore took "adverse actions" against Chuipek which ultimately resulted in the termination of his

job at Smart Motion. Additionally, the jury determined that a "causal connection" existed between

each adverse employment action and the corresponding protected activity in which Chuipek engaged.

That "causal connection" finding lies at the heart of Gilmore's argument that he did not act

willfully for purposes of § 523(a)(6). Specifically, Gilmore argues that the jury instructions did not

require any sort of intentional conduct. Rather, he asserts, the jury had to find merely a "causal

connection" for every retaliation claim against him in the state court action, and, thus, those claims

involved only an intent to act, not an intent to cause injury as required under the statutory exception

to discharge. Along the same lines, Gilmore contends that the punitive damages awarded to Chuipek

in connection with the § 1981 claim do not support a finding of willfulness because the jury was

24

instructed that only "reckless conduct" was required, a standard less demanding than the one under

§ 523(a)(6).[15]

The Court rejects Gilmore's arguments. True, the jury instructions did not include words or

phrases requiring an intent to cause injury, and the specific instruction with respect to punitive

damages required only "reckless disregard" for Chuipek's rights. However, as long as the jury in

a prior proceeding has found against the debtor "upon specific issue[s] of fact," which, when viewed

in the aggregate, "independently comprise elements of a [subsequent] dischargeability claim,"

collateral estoppel precludes the debtor "from relitigating those underlying facts in bankruptcy

court." *French Kezelis & Kominiarek, P.C. v. Carlson*, No. 99 C 6020, 2000 WL 226706, at *4

(N.D. Ill. Feb. 22, 2000) (citing *Klingman*, 831 F.2d at 1294-95). Here, the jury found such issues

of fact, including those that establish the element of willfulness under § 523(a)(6).

As set forth above, Chuipek can demonstrate the requisite willfulness by showing that

Gilmore either subjectively intended to injure him or knew that his actions were substantially certain

to result in injury. *See Gerard*, 780 F.3d at 811; *Horsfall*, 738 F.3d at 774; *Jacobs*, 403 B.R. at 581.

In this matter, the state court record provides extensive evidence establishing both.

As to subjective intent, in reaching its decision on the IHRA retaliation counts, the jury

necessarily found, pursuant to the instructions it was provided, that "Gilmore aided and [abetted]

Smart Motion . . . in taking an adverse employment action against [Chuipek] or was otherwise

personally motivated to retaliate against [him]." (Jury Instrs. at 14, 16 & 18.) Although the

instruction included the disjunctive form "or," the state court record is replete with evidence that

Gilmore was personally motivated to retaliate against Chuipek. In fact, in the state court order, the

---

[15] The Court further addresses this argument in its discussion below about the amount of the judgment debt that is nondischargeable.

judge expressly found that "there was sufficient evidence of such personal motivation by Gilmore." (June 23 Order at 7 ¶ 35.) That evidence includes uncontested testimony that Gilmore closed the door to and turned the lights on in the only men's bathroom at Smart Motion, giving the impression that it was in use in order to discourage people from going in, even though he knew that Chuipek suffered from Crohn's disease and needed to use the bathroom on a frequent basis as a result of his disorder. Despite that knowledge, the undisputed testimony also establishes that Gilmore denied Chuipek's requests both to post a sign on the door telling people to leave it open when the bathroom was not in use and to take time off to undergo surgery in connection with his medical condition.

According to Chuipek's testimony, after he confronted Gilmore about his alleged use of inappropriate and offensive comments, as well as the problems with the bathroom, Gilmore's attitude toward him changed, and their professional relationship soured. The uncontested evidence demonstrates that shortly after their confrontation, Gilmore called Chuipek into a meeting in which Gilmore questioned him about whom he had been talking to about sexual harassment, discrimination, and his Crohn's disease; asked him if he was planning to sue Gilmore; and then terminated him from his position as vice president of sales and marketing. All of this evidence supports the jury's necessary and implicit finding that Gilmore was personally motivated to retaliate against Chuipek for the complaints he made by unlawfully terminating his position at Smart Motion. Accordingly, the Court finds that Gilmore subjectively intended to injure Chuipek for purposes of § 523(a)(6).

The Court also finds that Gilmore acted with intent to injure Chuipek under the "substantial certainty" test. The state court record establishes that Gilmore unquestionably knew that injury was substantially certain to result from his wrongful termination of Chuipek from his job.

26

Notwithstanding Gilmore's testimony that the termination was not done in retaliation (*see* Tr. Ex. C at 131:13-17, 141:19-22), Gilmore was an experienced business owner who clearly understood both what he was doing and what the consequences of his actions would be. At the time of the events in question, Gilmore had been the president and co-owner of Smart Motion for more than a decade. (DSOF ¶ 1.) Together, he and Vickie developed innovative robotic technology for use in the egg industry. (*Id.* ¶ 2.) With Gilmore at the helm, Smart Motion had a workforce of eighteen employees and grossed over $1 million in sales in 2008 and more than $2.3 million in 2009, the years that Chuipek worked at the company. (Tr. Ex. C at 61:6-13; 66:6-19, 96:19-21.) In fact, business was so good that Gilmore was planning for the construction of a new facility. (Tr. Ex. B at 15:23-16:18; Tr. Ex. C at 84:7-86:10.) Despite the meteoric rise in Smart Motion's sales figures in those years, all of Gilmore's experience and knowledge, and his testimony that he "knew that retaliation [i]s illegal" (Tr. Ex. C at 146:19-21), he terminated Chuipek from his position. The finding that he did so in retaliation for Chuipek's requests for reasonable accommodations and for his complaints about discrimination is necessarily implied by the jury's verdict. Gilmore simply had to have known, without doubt, that injury was substantially certain to result from that termination. There is no other logical conclusion.

In sum, the jury's verdict, supported by substantial evidence from the state court record, establishes that Gilmore both subjectively intended to injure Chuipek and knew that his actions were substantially certain to result in injury. His conduct went beyond what can be characterized as

negligent or reckless. Accordingly, the Court concludes that Gilmore acted with willfulness for purposes of § 523(a)(6).[16]

## C. Malice

Turning to the final element of § 523(a)(6), conduct is "malicious" if it is undertaken "in conscious disregard of one's duties or without just cause or excuse." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (internal quotation omitted); *see also Horsfall*, 738 F.3d at 774 (quoting *Thirtyacre)*; *Fairgrieves*, 426 B.R. at 757; *Vozella v. Basel-Johnson (In re Basel-Johnson)*, 366 B.R. 831, 850 (Bankr. N.D. Ill. 2007). Accordingly, to establish malice under § 523(a)(6), Chuipek must prove that Gilmore: (1) intentionally committed a wrongful act, (2) which caused injury to Chuipek, and (3) which was done without just cause or excuse. *See Bauman*, 461 B.R. at 49; *Basel-Johnson*, 366 B.R. at 850. Gilmore need not have acted with ill will or a specific intent to harm Chuipek in order for his conduct to be considered malicious. *See id.*

Based on the state court testimony and the facts necessarily implied by the jury's verdict, the Court has already determined that Gilmore intentionally committed a wrongful act by terminating Chuipek's job in retaliation for his requests and complaints, thereby causing injury to Chuipek.

---

[16] Gilmore also argues that courts have found that retaliatory discharge does not satisfy the willfulness element of § 523(a)(6) in cases with "even more egregious findings than present here." (Resp. at 4.) In support of that argument, Gilmore relies on *Sanger v. Busch (In re Busch)*, 311 B.R. 657 (Bankr. N.D.N.Y. 2004), and *Vieyra v. Etzel (In re Etzel)*, Bankr. No. 13-61353-11, Adv. No. 14-00001, 2014 WL 2810191 (Bankr. D. Mont. June 20, 2014). That reliance is misplaced for a number of reasons. First, neither case focuses on claims of retaliation. Rather, the claims in the underlying case in *Busch* were for *quid pro quo* and hostile environment sexual harassment, 311 B.R. at 659-61, and the ones in *Etzel* were for unlawful sex discrimination, 2014 WL 2810191 at *1-6. Second, while each court found that collateral estoppel could not be applied in the subsequent dischargeability proceeding because the willfulness element of § 523(a)(6) had not been established, those decisions were necessarily based on the specific and unique facts of each case. Third, in reaching its conclusion, the *Busch* court used the "actual intent" test, rejecting the "substantial certainty" test which it identified as the "minority view" at that time. 311 B.R. at 669. It bears noting, however, that the same court later reconsidered the issue almost ten years later and subsequently adopted the "substantial certainty" test used by many circuit courts of appeal, including the Seventh Circuit. *Alvarez v. Chaffee (In re Chaffee)*, Bankr. No. 07-11636, Adv. No. 07-90171, 2013 WL 4716320, at *6 n.5 (Bankr. N.D.N.Y. Sept. 3, 2013). In any event, *Busch* and *Etzel* are non-precedential, and, as such, this Court is not bound to follow them.

Thus, all that remains to satisfy the malice element is a showing that Gilmore acted without just cause or excuse.

Challenging such a showing, Gilmore argues that he terminated Chuipek from his position for just cause and with good reason. Specifically, Gilmore testified at trial that he did not terminate Chuipek in retaliation but, rather, that his decision was based on what Gilmore characterized as Chuipek's weak sales performance. (Tr. Ex. C at 131:13-17, 141:19-22, 143:14.) Notwithstanding this contention, Gilmore acknowledged that Smart Motion's sales rose dramatically–to more than $1 million in 2008 and over $2.3 million in 2009–after he hired Chuipek. (*Id.* at 61:6-17; 66:6-19.) Those results, as well as Chuipek's corresponding testimony about his own sales figures, belie Gilmore's claim that he terminated Chuipek because he was a "poor sales performer." (*Id.* at 131:13-17, 141:19-22, 143:14.)

Despite Gilmore's proclamations that he did not act with animosity or a specific intent to harm Chuipek, the key to satisfying the "maliciousness" element of § 523(a)(6) is a "consciousness of wrongdoing." *Nicholas & Assocs., Inc. v. Morgan (In re Morgan)*, Bankr. No. 09 B 42248, Adv. No. 10 A 00253, 2011 WL 3651327, at *7 (Bankr. N.D. Ill. Aug. 18, 2011) (internal quotation omitted). Gilmore's consciousness of wrongdoing is readily apparent based on the questions he posed to Chuipek at the November 6 meeting. According to the undisputed testimony, he asked Chuipek to whom he had been talking about discrimination and his Crohn's disease, as well as whether Chuipek had hired a lawyer and was planning to sue him. A person with a clear conscience does not fear that he is going to be sued. Clearly Gilmore was aware of his wrongdoing.

A review of the jury instructions and its subsequent verdict demonstrates that the jury did not believe Gilmore's assertions that he terminated Chuipek's employment for monetary or economic

29

reasons–because Chuipek's job performance was weak or because sales were down.[17] Based on both

that review and the analysis above, the Court finds that Gilmore acted without just cause or excuse

and, therefore, with malice for purposes of § 523(a)(6).

In sum, the Court finds that the jury's verdict against Gilmore necessarily and implicitly

determined that Gilmore's conduct willfully and maliciously injured Chuipek. There is simply no

basis in the state court record to decide otherwise. Accordingly, the Court concludes that all of the

elements of § 523(a)(6) have been satisfied and that the judgment debt owed to Chuipek by Gilmore

is not dischargeable pursuant to that statutory exception to discharge.

### 3. Nondischargeable Amount

The next issue to decide is the amount of the judgment debt that is nondischargeable in this

matter. Chuipek seeks a determination that the entire debt of $724,316.52 is not dischargeable under

§ 523(a)(6). That figure consists of damages awarded by the judgment on the verdict in the amounts

of $400,000 for earnings and commissions lost up to the date of the state court trial, $25,000 for

emotional distress, and $25,000 in punitive damages, all as a result of Gilmore's conduct. The total

also includes $57,404.32 for post-judgment interest through August 3, 2015, the Petition Date (*see*

---

[17] Gilmore argues that a new hearing is warranted because the state court judge excluded "highly probative evidence" which would have established that Chuipek admitted that sales were "generally down" in 2009. (Resp. at 11.) Had that evidence been admitted, Gilmore suggests, he would have been able to prove that his termination of Chuipek's employment was "justifiable." (*Id.*) The transcript of the state court proceedings indicates that the evidence was the subject of Chuipek's motion to bar the findings in a report written by the Illinois Department of Human Rights, an independent, third-party fact-finder. (Docket No. 39-8, State Ct. Hr'g Tr. Jan. 30, 2014 at 28:17-29:2.) According to Gilmore, that evidence was excluded because Illinois state law prohibits its admission, but it would have been admissible in federal court under the exceptions to the rule against hearsay in Federal Rule of Evidence 803. (Resp. at 11.)

The Court rejects Gilmore's argument for three reasons. First, whether in state or federal court, the report's authenticity and trustworthiness are at issue because, according to the transcript of the state court hearing, the report had not been signed, the statements were not made under oath, and the report was simply a summary prepared by the investigator. *See, e.g., Kpotufe v. J.B. Hunt Transp., Inc.*, No. 1:10-cv-0539-RLY-MJD, 2011 WL 6092159, at *3-4 (S.D. Ind. Dec. 6, 2011). Second, to get the evidence in, Gilmore could have called the investigator as a witness during the state court proceedings, but he failed to do so. Finally, Gilmore failed to attach a copy of the excluded report itself, thus precluding the Court from making any determination as to its admissibility.

Pl.'s Mot. for Summ. J. ¶ 8), as well as $25,751.82 on the IWPCA claim, $19,500 for pre-judgment

interest on the jury's back-pay award, $163,430 for attorneys' fees, and $8,230.38 for costs, all

awarded by the state court judgment against Gilmore and Smart Motion, jointly and severally.

Gilmore argues that not all portions of the judgments are nondischargeable. Among those,

he says, are the damages of $25,751.82 on the IWPCA claim, the attorneys' fees of $163,430, and

the punitive damages of $25,000 assessed against him.[18] According to Gilmore, the IWPCA count

had "nothing to do with willful and malicious conduct"; rather, he says, it was based on a "breach

of contract type claim," and debts arising from such claims are dischargeable. (Resp. at 12-13.)

Gilmore further argues that the attorneys' fees were not incurred solely in connection with the

retaliation claims against him; instead, he contends, the case involved "primarily" claims against

Smart Motion, as well as "claims that are dischargeable (like the IWPCA claim)." (Id. at 13.) Thus,

he maintains that the attorneys' fees awarded in the state court case are dischargeable as well.

Finally, Gilmore argues that the punitive damages assessed against him are dischargeable because

they were awarded pursuant to a jury instruction requiring "reckless" conduct, not the more

demanding requirement of willfulness under § 523(a)(6).

Gilmore is wrong on all counts. When consequential damages arise from the same conduct

as the underlying nondischargeable judgment, those damages are not dischargeable under §

523(a)(6). *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (finding that damages

"derivative from the injury that the debtor committed intentionally" are also nondischargeable under

§ 523(a)(6)); *see also Cohen v. de la Cruz*, 523 U.S. 213, 221-23 (1998) (finding in the context of

---

[18] Gilmore also contends that the punitive damages of $25,000 assessed against Smart Motion are not dischargeable because § 523(a)(6) does not apply to corporate debtors. (Resp. at 12.) Regardless of the merit of that argument, the punitive damages awarded against Smart Motion are not included in the total amount sought by Chuipek.

§ 523(a)(2)(A) that money obtained by fraud prevents discharge of all liability arising from the fraud); *Klingman*, 831 F.2d at 1296 (finding in the context of § 523(a)(4) that "[a]ncillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt"). That is, where a judgment debt is found to be based on willful and malicious conduct on the part of a debtor, the entire judgment debt, including compensatory and other damages, interest, and attorneys' fees, is not dischargeable pursuant to § 523(a)(6). *Jendusa-Nicolai*, 677 F.3d at 322; *Taylor v. Snyder (In re Snyder)*, 542 B.R. 429, 437-38 (Bankr. N.D. Ill. 2015); *Littlefield v. McGuffey (In re McGuffey)*, 145 B.R. 582, 596 (Bankr. N.D. Ill. 1992).

Despite Gilmore's attempts to characterize the damages award on the IWPCA count as a breach of contract claim, that award arose from the same conduct as the primary debt. Specifically, the award was based on Gilmore's refusal to pay Chuipek wages or commissions from June 16, 2008 to November 9, 2009, the time period during which he was employed at Smart Motion. (*See* June 23 Order at 1 ¶ 1.) True, Gilmore attempted to avoid paying Chuipek by modifying the terms of a contract–the original employment agreement–to exclude commissions on income from parts and training. (*Id.* at 2 ¶¶ 5 & 6.) However, Gilmore's refusal to pay stemmed from his animus toward Chuipek and his consequent termination of Chuipek's position in retaliation for requesting reasonable accommodations and complaining about discriminatory conduct and comments. The IWPCA "ensures that [all] employees [in the state of Illinois] receive all earned benefits upon leaving their employer without retaliation from those employers." *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 468 (Bankr. N.D. Ill. 2011). The state court record establishes that Gilmore acted in retaliation, and the related damages on the IWPCA claim are, thus, not dischargeable under § 523(a)(6).

32

Similarly, courts have found that an award of attorneys' fees that is attached to a judgment debt deemed nondischargeable under § 523(a) is likewise nondischargeable because the fee award arises from the same conduct as the underlying debt. *Snyder*, 542 B.R. at 438; *McGuffey*, 145 B.R. at 596-97. Here, the attorneys' fees awarded by the state court relate solely to the court's judgment, and the debt pursuant to that judgment has been deemed nondischargeable by this Court. Therefore, the attorneys' fees awarded in the state court action are also nondischargeable under § 523(a)(6).

Gilmore's arguments in opposition to this result are both inaccurate and disingenuous. The state court case did not "primarily" involve claims against Smart Motion; rather, Chuipek asserted five claims against Gilmore and another five substantially similar claims against the company. Further, as Chuipek quite rightly notes, it is not possible to distinguish the fees incurred in connection with one claim from those incurred for others. All of the claims were litigated together, and all were based on Gilmore's conduct during the time that Chuipek worked at Smart Motion. Additionally, the state court awarded attorneys' fees against Gilmore and Smart Motion jointly and severally, making both parties fully responsible equally for the entire award. *See United States v. Scop*, 940 F.2d 1004, 1010 (7th Cir. 1991). For all of the reasons above, the Court holds that the attorneys' fees awarded by the state court in connection with the underlying judgment are also not dischargeable under § 523(a)(6).

As for the punitive damages assessed against Gilmore, the jury instructions did, indeed, require a finding that Gilmore's conduct was in "reckless disregard" of Chuipek's rights, a standard less exacting that the willful requirement under § 523(a)(6). As discussed above, however, the punitive damages here are based on the same conduct as the underlying nondischargeable judgment. *See Jendusa-Nicolai*, 677 F.3d at 322. Thus, they too are nondischargeable.

33

Given the case law and the analysis above, the Court finds that all components of the judgment debt, including the damages award on the IWPCA count, the attorneys' fees awarded by the state court, and the punitive damages assessed against Gilmore, arise from the same conduct as the underlying nondischargeable judgment. Accordingly, the entire debt is nondischargeable under § 523(a)(6).

## 4. Costs and Fees in the Adversary Proceeding

Finally, Chuipek seeks to recover from Gilmore the costs and fees arising from the litigation in this adversary proceeding. (*See* Adv. Compl. at 10; Pl.'s Mot. for Summ. J. at 5.)   Without citation to any legal authority, Gilmore opposes this request.

Under the traditional "American rule," each party bears his own costs and fees, absent statutory or contractual authority providing otherwise. *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 646 (7th Cir. 1992); *Swanson v. Am. Consumer Indus., Inc.*, 517 F.2d 555, 559 (7th Cir. 1975). Bankruptcy Rule 7054 provides such authority here, allowing courts to consider the award of both costs and fees to the prevailing party.

Specifically, Rule 7054 gives bankruptcy courts the discretion to award costs to the prevailing party in bankruptcy proceedings unless a federal statute or the Federal Rules of Bankruptcy Procedure provide otherwise. Fed. R. Bankr. P. 7054(b) (stating that "[t]he court *may* allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides" (emphasis added)). For purposes of Rule 7054, "costs" are defined as "an allowance which the law awards to the prevailing party against the losing party as an incident of the judgment to reimburse a party for certain expenses which that party has incurred in the maintenance of the action." *Banco Bilbao Vizcaya Argentaria Puerto Rico v. Vazquez (In re Vazquez)*, Bankr. No. 09-

34

01574, Adv. No. 10-00088, 2011 WL 3889245, at *1 (Bankr. D.P.R. Aug. 31, 2011), *aff'd*, 471 B.R. 752 (B.A.P. 1st Cir. 2012). Those costs include Clerk's Office fees; fees for printing, witnesses, copies of necessary materials, and transcripts; compensation for court-appointed experts and interpreters; and various docket fees. *See* 28 U.S.C. § 1920.

In this matter, Gilmore has failed to point to a federal statute or bankruptcy rule that would preclude the Court from awarding Chuipek the costs he incurred in pursuing this adversary proceeding. Accordingly, the Court will consider such an award. Chuipek is directed to file a detailed statement of his costs for the Court's review, as well as to serve a copy of that statement on Gilmore. *See* Local Bankr. R. 7054-1(A).

Chuipek's request for the assessment of attorneys' fees against Gilmore is similarly left to the discretion of the Court, but such a request "must be made by motion." Fed. R. Civ. P. 54(d)(2)(A) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7054(b)(2)(A)). In considering the award of attorneys' fees, the court's discretion must be "exercised with restraint." *In re Roco Corp.*, 37 B.R. 770, 775 (Bankr. D.R.I. 1984); *see also James v. Prince (In re Prince)*, Case No. 16-80978-TRC, Adv. No. 16-8026-TRC, 2017 WL 2601889, at *1 (Bankr. E.D. Okla. June 15, 2017). Indeed, the court's authority to award such fees is not unrestricted and must be "reserved for exceptional situations." *Roco Corp.*, 37 B.R. at 775.

As the prevailing party here, Chuipek will be granted leave to file a motion for the attorneys' fees he incurred in connection with the instant adversary proceeding. He must file such motion no later than twenty-one days after the entry of this judgment, include with the motion supporting time sheets itemizing the fees sought, and comply with the other requirements set forth in Federal Rule of Civil Procedure 54(d)(2)(B). The motion should also identify exceptional circumstances that

demand redress and justify the award of attorneys' fees against Gilmore and to Chuipek in this matter.

## CONCLUSION

For the foregoing reasons, the Court finds that the facts necessarily and implicitly determined by the verdict rendered by the jury in the prior state court case compellingly establish that Gilmore acted with willfulness and malice for purposes of § 523(a)(6). Based on those facts and the application of the doctrine of collateral estoppel, the Court concludes that there are no genuine issues of material fact and that Chuipek is entitled to judgment as a matter of law. Accordingly, the Court holds that the debt owed to Chuipek by Gilmore, in the total amount of $724,316.52, and any costs and attorneys' fees incurred in this adversary proceeding which subsequently may be awarded to Chuipek pursuant to a separate motion and order are nondischargeable under § 523(a)(6). A separate order will be entered consistent with this Memorandum Opinion.

Dated:  **September 27, 2018**            **ENTERED:**

                                          Janet S. Baer
                                          United States Bankruptcy Judge

36